### In re THOMPSON.*

(Circuit Court of Appeals, Third Circuit.  September 28, 1922.)

Nos. 2802, 2801, 2808, 2809.

1. **Bills and notes** ⊜⟹347—**Taker after maturity not holder in due course.**
   A bank acquiring notes after maturity was not a holder in due course, under Act Pa. May 16, 1901, § 57 (P. L. 194; Pa. St. 1920, § 16047).

2. **Bankruptcy** ⊜⟹467—**Finding of referee approved by court not reversed in absence of plain error.**
   Findings of referee upon conflicting evidence, approved by the bankruptcy court will not be overturned in the absence of demonstration of plain mistake.

3. **Bills and notes** ⊜⟹522—**Evidence held not to show fraud.**
   Evidence *held* not to show fraudulent diversion of a note.

4. **Bankruptcy** ⊜⟹293(1)—**Bankruptcy court cannot try title to property.**
   A court of bankruptcy is without jurisdiction in an action by trustees in bankruptcy to set aside fraudulent purchases and transfers of property or to adjudge the purchaser's title good or fraudulent or to compel an accounting of collateral.

5. **Pledges** ⊜⟹56(6)—**Pledgee cannot become purchaser at his own sale.**
   To become a purchaser at his own sale a pledgee must reserve the right or pursue an appropriate remedy at law or in equity under Act Pa. June 16, 1836, § 23 (P. L. 755; Pa. St. 1920, § 10371).

6. **Pledges** ⊜⟹56(6)—**Pledgee, by purchasing at his own sale, converts the property.**
   Where pledgee purchased at his own sale through his attorney, without authority from the pledgor, he illegally converted the pledge, and thereafter held it subject to the original trust, and, the value of the pledge being greater than the debt, he paid the debt by such conversion.

7. **Bankruptcy** ⊜⟹341—**Bankruptcy court has jurisdiction to determine whether debt secured by pledge was paid by conversion of the pledged property.**
   A bankruptcy court had jurisdiction to determine whether a claim presented, which was secured by a pledge of property of value exceeding the amount of the debt, had been paid by the conversion of the pledged property by the pledgee's unauthorized purchase thereof at his own sale.

8. **Bankruptcy** ⊜⟹323—**Judgment on mortgage given as security is itself but security.**
   As respects a claim secured by mortgage, the reduction to judgment of the mortgage did not change its quality as collateral, but the existence of the obligation of the mortgage when reduced to judgment depended on whether the debt secured remained due or had been discharged.

9. **Pledges** ⊜⟹56(6)—**Power given by first note to pledgee to purchase at his own sale held not to extend to second note.**
   Where first note gave pledgee power to purchase at his own sale, such power did not extend to sale under a second note, although the last para-

---

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 260 U. S. ——, 43 Sup. Ct. 248, 67 L. Ed. ——.

284 F.—5

graph of the second note recited that the pledged bonds "are to be held also as additional collateral on" the first note.

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

In the matter of the bankruptcy of Josiah Van Kirk Thompson. Claims of the Farmers' Bank at Clarksburg, W. Va., of A. J. Fletcher, of William T. Hartman, and of F. E. Markell, respectively, were disallowed ([D. C.] 276 Fed. 313), and claimants appeal. Affirmed as to claims of Farmers' Bank, William T. Hartman, and F. E. Markell, and reversed as to claim of A. J. Fletcher.

Nos. 2802, 2801:

J. E. Law, of Clarksburg, W. Va., and A. T. Morgan and Sidney J. Watts, both of Pittsburgh, Pa., for appellant.

Weil, Christy & Weil, of Pittsburgh, Pa., Waitman H. Conaway, of Fairmont, W. Va., and Umbel, Robinson, McKean & Williams, of Uniontown, Pa., for appellees.

No. 2808:

Warder & Robinson, of Grafton, W. Va., for appellant.

Weil, Christy & Weil, of Pittsburgh, Pa., Umbel, Robinson, McKean & Williams, of Uniontown, Pa., and W. H. Conaway, of Fairmont, W. Va. (A. Leo Weil, of Pittsburgh, Pa., of counsel), for appellees.

No. 2809:

Sterling, Higbee & Matthews, of Uniontown, Pa. (E. C. Higbee, of Uniontown, Pa., of counsel), for appellant.

Weil, Christy & Weil, of Pittsburgh, Pa., Umbel, Robinson, McKean & Williams, of Uniontown, Pa., and Waitman H. Conaway, of Fairmont, W. Va. (A. Leo. Weil, of Pittsburgh, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. These appeals are from orders of the District Court reviewing the action of a referee in bankruptcy in allowing and disallowing sundry claims against the estate of J. V. Thompson, bankrupt. Being of common origin and being related either on their facts or in principle, they were heard together and will be disposed of in one opinion.

Appeal of the Farmers' Bank at Clarksburg, West Virginia.

The claim of the bank is based on fourteen promissory notes for $5,000 each, drawn by J. R. Barnes and J. V. Thompson to the order of S. W. Shrader, by him endorsed and delivered in a personal transaction to C. W. Furbee, cashier of the bank, and acquired by the bank from Furbee as security for a debt.

These were the actors in the case. What they did, as found by the referee and the court, was as follows:

Thompson was a large coal operator in Western Pennsylvania and West Virginia. As was well known in that region, he was also a large borrower of money on his negotiable paper. On this occasion he gave

notes, dated in October and November, 1914, aggregating $100,000 and running from four to fourteen months, to Shrader to be negotiated, the money realized therefrom to be paid to him and his co-maker. In January, 1915, Thompson went into the hands of receivers. In August of the same year, Shrader—upon a story which was wholly untrue—offered to sell Furbee $50,000 of the Thompson notes for a note of his own for $12,500. Admittedly some of the notes had matured; some, it is claimed, had not matured; all were the notes of an insolvent maker, with reference to the outcome of whose affairs the public entertained widely divergent opinions. Desiring to speculate in Thompson paper, Furbee made the purchase, that is, he traded a note of his own for $12,500 for notes of Thompson amounting to $50,000. Later, Furbee bought from Shrader other Thompson notes to the amount of $20,000 and paid for them with his note for $7,500. The first Furbee note was paid by his brother, Walter S. Furbee, and Shrader got the money; the second was reduced to judgment and the judgment remains unsatisfied. After all the Thompson notes had matured, the bank, discovering that Furbee, its cashier, had been loaning its money without its knowledge to an insolvent concern and suffering thereby a substantial loss, acquired from him the $70,000 of Thompson notes as security for his obligation. On these notes the bank filed against the Thompson estate the claim in dispute.

[1, 2] Concededly, the bank in acquiring the Thompson notes after maturity was not itself "a holder in due course" under the Uniform Negotiable Instruments Act of Pennsylvania (Act of May 16, 1901 [P. L. 194; Pa. St. 1920, § 15982 et seq.]), holding "the instruments free from any defect of title of prior parties, and free from defenses available to prior parties among themselves." Section 57 (section 16047). At best it held only the title of Furbee, whatever that was. The case then turned on the question whether Furbee was himself a holder in due course. Sections 52, 56–59 (sections 16042, 16046–16049). The referee, and the court, found Furbee's title defective because Shrader was without authority to deal for his own benefit in notes which Thompson had entrusted to him for negotiation, or to do anything with them other than to negotiate them for the account of the makers, and also because the circumstances—some within his knowledge and others of a character which imposed upon him the duty of making inquiries—were such as to constitute notice to Furbee of Shrader's breach of trust and the consequent defect in Shrader's title, and, moreover, were such as to make his own participation in the transaction one of bad faith. Pennsylvania Act, supra, section 56 (section 16046); Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Hotchkiss v. National Bank, 21 Wall. (88 U. S.) 354, 22 L. Ed. 645; Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585. On a finding of these facts the referee disallowed the claim and on review the District Court affirmed the referee. On this appeal our inquiry has been directed first to the sufficiency of the testimony to sustain the conclusions reached, Rorabaugh's Estate, 229 Pa. 377, 78 Atl. 849; and next to the presence of manifest error. In pursuing these lines of investigation, we have found ample testimony to sustain the action of the referee and the court; and in the absence of "a demonstration of a

plain mistake" in the deductions made from the conflicting testimony, we do not regard ourselves warranted in overturning the conclusions of two courts. Ohio Valley Bank Co. v. Mack, 163 Fed. 155, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184.

The order of the District Court is affirmed.

## Appeal of A. J. Fletcher.

[3] C. W. Furbee, Guy S. Furbee and A. J. Fletcher had loaned S. W. Shrader $18,000 on a mortgage covering an oil property. When the enterprise failed, C. W. Furbee, acting for himself and his associates, called upon Shrader for additional security. Shrader sent him $25,000 of Thompson notes. In distributing the notes, Furbee gave Guy S. Furbee one for $5,000, A. J. Fletcher one for $10,000, and retained one for $10,000, these sums being about the proportions the parties had respectively contributed to the loan. Fletcher's proof of claim, here in controversy, is on his $10,000 Thompson note. The referee disallowed the claim and the District Court affirmed the referee.

Limiting our discussion to the Thompson note in the hands of Fletcher, there is a dispute about the date upon which Furbee received the note and also a dispute about the date upon which it came to Fletcher, raising questions as to whether, in either instance, the note passed before or after maturity.

The referee found that the note had been delivered by Furbee to Fletcher and by Shrader to Furbee after maturity. Holding that Fletcher's right to allowance of the claim rests on Furbee's position as "a holder in due course" under the Pennsylvania Act, supra, the referee also found that the note was affected by an infirmity because of a misuse of it by Shrader amounting to a breach of faith, with reference to which Furbee assumed a wilful ignorance equivalent, in law, to guilty knowledge. It is a fair conclusion that Fletcher obtained the note from Furbee after maturity. Although we are inclined to think that Furbee received the note from Shrader before maturity, we yield to the opposite finding of the referee and court. Ohio Valley Bank Co. v. Mack, 163 Fed. 155, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184. Even so, we are at a loss to discover any evidence of infirmity in the note arising from a defect in Shrader's title and from Furbee's knowledge of it. It is true, as intimated by both the referee and court, the transaction is not free from suspicion. Yet the fact which distinguishes this case from the case on the appeal of the Farmers' Bank at Clarksburg, West Virginia, supra, is that in the case of the bank there was conflicting testimony on the issue of Furbee's constructive knowledge of infirmity in the title of the notes there in question; here there is no testimony, conflicting or otherwise, indicating that Shrader was guilty of a breach of faith or an act of fraud in delivering the Thompson notes to Furbee; no testimony by Thompson, or any one else, that the note delivered to Furbee, and by him to Fletcher, was one of a number which he had given Shrader to be negotiated; and no testimony that Shrader had done anything with the note other than that which he had a right to do. We can readily understand that by the light which subsequent litigation had cast on Shrader's transactions (frequently before the bankruptcy court), in which it appears he had

made free use of Thompson's notes, rather than by events at the time, the referee and the court might unconsciously have been influenced in reaching the conclusion that this transaction was like the others. Indeed, it may have been; yet we cannot find evidence in the record of this case—and on this record alone this case must be decided—that it was so. Pursuing the inquiry which devolves upon this court in an appeal of this character, we are constrained to hold there is no testimony which sustains the action of the referee and the court in disallowing the Fletcher claim. Rorabaugh's Estate, 229 Pa. 377, 78 Atl. 849; Kvist's Estate, 256 Pa. 30, 100 Atl. 523. Therefore, the order of the court must be reversed with a direction that the claim be allowed.

## Appeal of William T. Hartman.

[4] Thompson gave Hartman, the claimant, two promissory notes, one for $10,000 and the other for $15,000, with stocks and bonds of the value of $39,500 pledged as collateral security. After default at maturity and more than four months before Thompson's bankruptcy, Hartman reduced the notes to judgment. About three weeks before bankruptcy, he offered the collateral for sale in conformity, we may assume, with the power contained in the notes with respect to notice and character of sale, and sold the same to his attorney for $2,976. Later he acquired the collateral from his attorney by paying him a like sum. Crediting the proceeds of the sale upon the debt, Hartman then filed against the Thompson estate a proof of claim on the notes —not on the judgment—for the sum of $24,484.91, with interest. The trustees filed objections to its allowance, alleging that the sale was collusive in that the purchase of the collateral, while made ostensibly by Hartman's attorney, was actually made by Hartman himself and was a fraud against the bankrupt estate, and that, in consequence, the sale was void, praying that the claim be disallowed and that the trustees be awarded an accounting of the collateral showing its value over and above the debt. The trustees urged these several contentions upon the theory that the pledged property belonged to the estate, thereby raising a dispute of title between themselves and the purchaser. Regarding the case solely upon this theory, the referee correctly held, under authority of Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, Mitchell v. McClure, 178 U. S. 539, 20 Sup. Ct. 1000, 44 L. Ed. 1182, and Wood, Trustee v. Wilbert, 226 U. S. 384, 33 Sup. Ct. 125, 57 L. Ed. 264, that a court of bankruptcy is without jurisdiction in an action by trustees in bankruptcy to set aside fraudulent purchases and transfers of property; or to adjudge the purchaser's title, good or fraudulent; or to compel an accounting of collateral; and accordingly allowed the claim. The case then went to the District Court on a certificate for review. There, however, it was presented on a wholly different theory.

In the District Court the trustees abandoned their allegation of collusion and actual fraud in the sale of the collateral, also their prayer for an accounting, and took the position that the notes, while giving Hartman, the payee, power on default to sell the pledged property, did not authorize him to purchase it; that he, not his attorney, actually made the purchase; that his purchase without authority amounted

to an illegal conversion by him of the pledged property; that the value of the property was greater than the debt; and that, in consequence, Hartman had thereby been paid the full amount of the claim he was there asserting. Being similarly impressed, the learned District Judge reversed the order of the referee. This appeal followed.

[5] We discover no infirmity in this position. Certainly the notes contain no language authorizing the payee to purchase the pledged property. To become a purchaser at his own sale a pledgee must reserve the right, McManus v. Sweatnam, 42 Leg. Int. (Pa.) 387; In re Mertens, 144 Fed. 818, 75 C. C. A. 548, appeal affirmed, see Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; Story on Bailments, 319; or pursue an appropriate remedy at law, or in equity, Pennsylvania Act of June 16, 1836, § 23 (P. L. 755; Pa. St. 1920, § 10371); Bispham's Eq. § 359; Davis v. Funk, 39 Pa. 343, 80 Am. Dec. 519; Sitgreaves v. F. & M. Bank, 49 Pa. 359.

[6, 7] We accept without question the finding of the District Court that the sale to Hartman's attorney was merely colorable and that Hartman himself purchased the pledged property. By doing so without authority from the pledgor he illegally converted the pledge and still holds it subject to the original trust, and as the value of the pledge is greater than the debt, he has paid himself all that Thompson owed him. Diller v. Brubaker, 52 Pa. 498, 91 Am. Dec. 177; Sproul v. Sloan, 241 Pa. 286, 88 Atl. 501, Ann. Cas. 1915B, 941; Cadwalader's Appeal, 64 Pa. 293; Register v. Sellers, 4 Pa. Co. Ct. R. 490. As the claimant has chosen a court of bankruptcy as his forum, he cannot be heard to complain if, in its adjudication, the debt which he asserts is found to have been paid. Jurisdiction of a court of bankruptcy validly to entertain a defense of payment to a proof of claim should not be confused with lack of jurisdiction of a court of bankruptcy to set aside fraudulent sales and transfers of property, supra. As the trustees are not now craving an accounting and are not demanding a return of any part of the pledge, the case comes to an end with an affirmance of the order of the District Court disallowing the claim.

## Appeal of F. E. Markell.

This controversy in bankruptcy arose from transactions given at length in the opinion of the District Court, reported in 276 Fed. 313. Abridging the statement for the purpose of this discussion, the main facts are as follows:

Thompson borrowed from Markell $50,000 on his promissory note, with bonds of one of his coal companies in the sum of $50,000 as collateral security. Later, he borrowed from Markell $30,000 on his promissory note, with bonds of two of his coal companies in the sum of $40,000 as collateral security. These notes came to be known respectively as the first note and the second note. Thompson's coal companies became involved in his affairs and Markell called for additional security. Thompson gave him a mortgage on coal lands for the real debt of $80,000. Thus for loans of $80,000 Markell held collateral security of the face value of $170,000.

Upon default, Markell reduced the two notes to judgment. He advertised the $90,000 of personal collateral for sale, ostensibly un-

der the powers given by the notes, and bought it in for $5,000. He then brought an action of scire facias on the mortgage and, crediting the debt of the notes with the $5,000 purchase price of the personal collateral, obtained judgment for $89,940 and interest. Thompson's bankruptcy followed.

In the administration of the bankrupt estate the trustees sold, free of liens, two tracts of land covered by the mortgage and with the proceeds paid Markell the sum of $81,188.20. Later, they sold another tract, free of liens, and the court transferred the lien of the mortgage to the fund, which was more than enough to pay any claim that Markell might make. Markell then filed a proof of claim against the Thompson estate, based not on the notes nor on the judgment entered on the notes but on the mortgage, for a balance of $19,600.39 which he represented to be due after crediting the proceeds of the sale of collateral and the proceeds of the first sale of mortgaged premises.

The referee, misconceiving the proceeding as in the Hartman Case, supra, regarded the controversy as one of title to property held by Markell adverse to the claim of the trustees, and, as in that case, allowed the proof of claim upon authority of Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, and Mitchell v. McClure, 178 U. S. 539, 20 Sup. Ct. 1000, 44 L. Ed. 1182. On certificate for review the District Court, applying the principle which controlled its judgment in the Hartman Case, reversed the order of the referee and disallowed the claim. Its action is here on appeal.

Being in full accord with the conclusions of the learned district judge, we should be content to rest our judgment on his closely reasoned opinion were it not a feeling that counsel for the claimant, because of the thoroughness with which he presented his case, is entitled to a more particular expression of our views. While there is little if anything we can add to the discussion, we shall review the case, not in the chronological order of events as the district judge did, but in the reverse order evidently preferred by counsel, and see whether, by applying this test, the same or a different conclusion is reached.

The first event in this order—and the last in the history of the case as it reached the court—was the appearance of Markell in the court of bankruptcy and his filing of a proof of claim on the mortgage for a balance due by the Thompson estate. While this would seem to be a statement of a fact so vital to the allowance of the claim that it could not be disputed, the claimant, nevertheless, challenges it at the threshold. Although he entitled his proof of claim in the District Court and therein set out a debt due him by the bankrupt estate on the security of a mortgage given by the bankrupt, made demand for payment, not from a particular fund but from the estate, and filed the same with the referee in bankruptcy, the claimant maintains, as against the jurisdiction of the court of bankruptcy to adjudicate the claim, that "as a secured creditor and seeking only to realize on his securities (he) was not in the bankruptcy court at all." Obviously, this contention is without merit. The claimant chose the court of bankruptcy as his forum. Having come into that court, he was there. Being there, he told the court the estate was indebted to him, and, offering proof, asked the court to order the estate to pay. The trustees

said the estate was not indebted to him, and, likewise offering proof, asked the court to deny payment. Having himself invoked the jurisdiction of the court of bankruptcy to make an order of payment, he cannot deny its jurisdiction to adjudicate an issue, which, when raised, is a prerequisite to the allowance of the order asked for.

The claimant next challenges the statement of the first fact in the order of our discussion on the contention that as the court had transferred the lien of the mortgage to the fund arising from the sale of the mortgaged premises (although the proof of claim contains no reference to the sale, to the transfer of the lien, or to the fund), the claim is not against the estate but is against the fund, and that any question as to the claimant's demand against this fund—previously burdened by the court with the transferred lien of the mortgage—is not justiciable by the court of bankruptcy, and that, in consequence, the court, on the claimant's proof of claim, is "bound to award the fund to him," or, as he otherwise states, "there is no alternative (for the court) but direction to the trustees to pay it."

[8] While we have no doubt that the court of bankruptcy had jurisdiction to inquire into the proof of claim and require the claimant to sustain by evidence his averment of a debt payable to him by the estate, either from its general funds or from a particular fund, we shall discuss for a moment the claimant's rather startling proposition that the court was helpless to do anything other than order payment of his debt. This proposition is grounded on what we may term the tactics of the claimant in basing his claim not on the original debt but on the mortgage security for the debt. Relying solely on the mortgage, counsel for the claimant opened the case before the referee by saying:

"F. E. Markell does not claim anything out of the bankrupt estate, but as expressed by the English courts, sits on his security."

No on can complain of this position. But the question is, what *is* his security? The claimant says it is a judgment of scire facias on a mortgage and maintains that, upon the failure of the mortgagor to interpose a defense, the judgment is conclusive upon him and upon his bankrupt estate as to amount and lien, and conclusive also upon the court when payment is demanded from the fund to which the court had transferred the lien. This, conceivably, might be so if this were all there is to be said about the mortgage. A mortgage in Pennsylvania is not a defeasible conveyance but is a high security for the payment of a debt, evidenced by the accompanying bond. Commonwealth v. Wilson, 34 Pa. 67; Eagle Beneficial Society's Appeal, 75 Pa. 226; Hodgdon v. Naglee, 5 Watts & S. (Pa.) 217; Tubbs' Estate, 161 Pa. 254, 28 Atl. 1109; In re Davis, 174 Fed. 556, 98 C. C. A. 338. The mortgage in this case had that quality and in addition it had the quality of being expressly pledged as collateral security for the payment of the debt on the two notes. Obviously, then, the "security" on which the claimant chose to sit was collateral security. Its reduction to judgment did not change its nature or take away this quality; nor did the judgment thereafter become the principal obligation. It stood back of the debt on the notes so long as that debt re-

mained unpaid; or, stated in another way, the existence of the obligation of the mortgage (when reduced to judgment) depends upon whether the debt on the notes, to secure the payment of which the mortgage was given, remains due or was discharged by the sale of the personal collateral; for payment of the debt of the notes, like payment of the debt of a bond, extinguishes the mortgage, just as, in law, satisfaction of a judgment on a bond works a satisfaction of a judgment on the mortgage. Therefore we must inquire whether the principal debt on the notes has been paid. Judgment on the collateral cannot close the door to this inquiry. In re Continental Engine Co., 234 Fed. 58, 60, 148 C. C. A. 74. That it is a valid inquiry has been decided by this court, In re Davis, 174 Fed. 556, 98 C. C. A. 338 (In re Dix [D. C.] 176 Fed. 582), where at a sale under a judgment on a mortgage for $50,000 against the bankrupt, the mortgagee (holding a second mortgage) purchased the property on a bid only sufficient to cover costs and then filed proof of claim for the full amount of the debt on the bond. The court inquired into the value of the real security, ascertained that it exceeded the debt on the bond, and, disallowing the claim, held that the debt had been paid by the purchase of the property. So here we may inquire whether the debt on the notes has been paid.

This brings us to Markell's transactions with the collateral securities for the debt on the notes. The principal figures in those transactions are these: Markell loaned Thompson $80,000, which with unpaid interest would, without credits, have amounted to $115,000, in round numbers, at the time he filed his proof of claim. Before filing his proof of claim Markell had received over $81,000 in cash from the trustees and had, for the nominal consideration of $5,000, converted to himself $90,000 of personal collateral, proven to be worth $63,000. Having received cash and property of the value of $144,000 on a debt of $115,000, it would seem that the debt had been paid. Yet Markell asks for a payment of a balance of $19,600. And he is entitled to it— if the sale of the personal collateral was valid.

[9] On the issue of validity of the sale the claimant points out that the learned trial judge did not, in terms, find the sale invalid. Literally this may be true, yet it was only on a finding of invalidity that he could possibly have rendered the judgment he did. From the authorities on which he relied, it is clear that the validity of the sale of the personal collateral depends upon strict compliance with the power of sale contained in the notes. The first note authorized the holder to sell the pledged collateral at public or private sale and conferred upon him the right to purchase the same as any other bidder. The second note gave the holder like authority to sell the collateral there pledged but gave him no right to bid for and become the purchaser thereof at such a sale. Sale of the collateral under both notes was advertised and held at one time. Markell purchased it all for $5,000. This was a sale of pledged property. With respect to such property the law regards the pledgee as trustee in several respects: First, he holds it in trust for himself to the extent of his claim; next, for the pledgor as to the residue. Being a trust he is bound to perform it in absolute good faith, dealing fairly with the pledge and using every

honest effort to obtain its real value. Register v. Sellers, 4 Pa. Co.
Ct. R. 490; Diller v. Brubaker, 52 Pa. 498, 91 Am. Dec. 177; Heston-
ville R. Co. v. Shields, 3 Brewst. (Pa.) 257; Sproul v. Sloan, 241 Pa.
286, 88 Atl. 501, Ann. Cas. 1915B, 941; Cadwalader's Appeal, 64 Pa.
293; Sitgreaves v. F. & M. Bank, 49 Pa. 359; Hiscock v. Bank, 206
U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. Applying this principle to
the facts of the case, as did the trial judge, we cannot say that he com-
mitted error in finding the sale invalid. But aside from the finding of
illegality in the sale, broadly made by the learned district judge, and
without regard to bad faith in the whole transaction of sale, we note
that Markell's purchase of collateral pledged under the second note
was illegal because made without authority. As we have said, that
note gave the purchaser no right to bid and buy at his own sale. The
law is settled that to exercise such a right it must be granted by the
note in plain terms, McManus v. Sweatnam, 42 Leg. Int. (Pa.) 387;
In re Mertens, 144 Fed. 818, 75 C. C. A. 548, appeal affirmed. See
Hiscock v. Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; Storey
on Bailments, 319; or the holder must pursue an appropriate remedy
at law, or in equity. Hartman, supra. The collateral Markell pur-
chased without authority at the sale under the second note was of a
value more than sufficient to offset his claim of $19,600. Doubtless
he realized the effect of this, and, in an effort to treat this collateral
as though sold under the power of the first note, he now places re-
liance on the last paragraph of the second note, which states that "the
bonds (here pledged) are to be held *also* as additional collateral on
note of July 2, 1913, for $50,000"—the first note. But this provision
does not help him because it does not pledge the collateral of the sec-
ond note under the power of sale of the first note, with the right given
the holder to purchase at his sale. It was a pledge of collateral on the
first note subordinate to the primary pledge on the second. The col-
lateral under the second note was sold under the power of that note
with its fatal omission of authority to the holder to bid and buy, and
being purchased by Markell, the holder, the purchase was invalid
because of that omission.

Summarizing this discussion, we accept the claimant's position of sit-
ting on his security and decide the case on the theory that his mortgage
was collateral security for the debt on the notes; that the judgment
rendered on the mortgage was likewise collateral security and was not
conclusive upon the parties, or upon the court, of the amount of the
principal obligation or the fact of a lien; that the quality of collateral
security persisted throughout, as it was bound to do, until the orig-
inal debt was paid; and that the original debt was fully paid, in part
by cash and in part by the unlawful conversion by the claimant of col-
lateral securities more than sufficient to discharge the debt. As the
trustees are not asserting title to the collateral sold, are not attempting
to recover it, or to set aside the sale, but are resisting payment on the
ground that payment in full has already been made, the order of the
District Court disallowing the proof of claim must be affirmed.